Thank you. We'll call our last case of today. Our last case of today is number 17-1990 Lifewatch Services, Inc. v. Highmark, Inc. et al. Messengers Eldon and Leighton. Thank you, Your Honor. May I reserve up to eight minutes for reply? Sure. We'll put you all on. This is an antitrust case, and it was dismissed. We're trying to reverse the dismissal. The essence is concerted refusal to deal. I know the court's read the briefs, and everything's quite repetitive, the court opinion and everything. So let me just very quickly point out that the plaintiff is selling a product in the mobile cardiac monitor business. If you have certain types of heart problems, you can wear this on your body. You walk around, and then the doctor diagnoses it. You bring it in, you phone it in, or for our telemetry product, it's automatically sent in like on your cell phone. So you're saying he picked a product too narrowly. He should have picked outpatient cardiac monitors, right? Correct. In fact... Just before we get to that, you can... If you show there's an agreement, you can then rely on the market for anti-competitive effects in a particular geographical area and product market. But insurance market, you made it... Those allegations are your complaint, but you really didn't pursue those at the district court or here. Why? We plead our complaint with both the seller-side conspiracy and the buyer-side conspiracy, knowing that in the Third Circuit, but not in all circuits, we only have standing to bring the buyer-side conspiracy. However, just in case the Supreme Court changes the law, we thought we'd better plead them both. We don't want a statute of limitations problem. But as long as West Penn's law, and I assume it's going to continue to be, we're not suggesting it's wrong, as long as West Penn's law is very clear in the Third Circuit, the clearest circuit where this issue is decided. Sellers can only sue for buyer-side conspiracies, that's us. The buyers, which is the policyholders, can only sue for the seller-side. It's the same facts. But we have no standing to bring theirs. And in fact, this is a convenient point. I can start with the standing point. You're the only people in the world who can bring this case. If we don't have standing to bring this case, no one does. Because in the Third Circuit, the policyholders plainly do not have standing to bring the case. So there's a conspiracy not to buy our product. We're the ones who suffer from it on the buyer-side. If we cancel, nobody cancels. I think under West Penn, it's obvious we have standing. I will say nothing more about that. And let me go through the other arguments in order. I don't think I'm in any order. But I can quickly go through the first two arguments. Try to spend a little time on McCown-Ferguson. The question of whether we pled an agreement. Everyone admits, defendants in the brief make a big point in admitting, that there is a medical policy. And what that means is... But what specific portions of your complaint provide factual allegations of an agreement? Okay, that would be... We actually have it right in the table of contents, so I can find it easily. Page 25 of the complaint, I believe. How uniformly rule coupled with Blue Cross' market power restrains competition. And then... I'm sorry, let me say... Excuse me. What specific portions of the complaint give us factual allegations of an agreement? The factual allegations by memory are... I was going to read them, but by memory are... They have a medical policy that specifically tells everybody what's insured, what's not insured. Hundreds of thousands of different things. Is this the uniformity rule that you reference? Excuse me? You call it the uniformity rule. We call the whole thing the uniformity rule, just to not have to describe it at such length. They call it the medical policy, which is a piece of the medical uniformity rule. That's the agreement. The uniformity rule is the agreement? The uniformity rule is the collection of practices and written agreements. It's not all in one single written agreement. Very rarely does a defendant commit to writing a criminal act. So they didn't do that here. But what do you make of their argument that there are blues that do purchase these devices? So there is no uniformity. We specifically address the argument there's 36 blue plans. There's hundreds or thousands of coverage issues. You don't have to have agreement on every single issue by every single plan, but you have to have a substantial agreement. But it sounds like the plans can make independent... Excuse me? It sounds like the plans can make independent judgments. They're not under compulsion of the model policy. They might tend to follow it. It's a good idea. Our allegations are specifically to the contrary. Our allegations are very rarely, as a plaintiff under Rule 11, able to come in as we can, having talked to witnesses, with exactly how they do it. They meet every year. They agree on this medical policy, which then says it's a recommendation. But then the association, which controls their ability to use the Blue Cross name, audits them for substantial compliance with the recommendations, and if they don't comply substantially with the recommendations, sanctions them, including by withdrawing the right to use the Blue Cross name. So we have an agreement. We don't think there's even going to be a dispute that this is how it works. There's 36 companies come together, agree on how to interpret the policies, and they don't have to bring all 1,000 of them or whatever thousands there are. They can have a few exceptions. What happened was, and I know the reason why, but it's not plagued. There are two companies that worked out separate deals with us to cover it, and that will be explained at trial when you see that. But all the rest follow this policy. Your product is about twice as much as a competitor. Is that fairly accurate? Yes and no. There's four. I know it does more than your competitor. You have a very sophisticated piece of equipment. If I could just correct that, there's four products. We are three times as expensive as the least expensive product. We're one-third as expensive as the most expensive product. We're kind of in the middle. Excuse me now. But an insured who has a need and has a doctor who says, your product is the best on the market, can make an application to have that product insured by anyone in the plans. Is that accurate or not? No, it's not accurate. Blue Cross will not insure our product. And the only way a patient, the doctor has absolutely no say on it, the only way a patient could get coverage would be by changing jobs or by persuading its employer to switch from Blue Cross to Aetna. So under no circumstances do the blue plans approve the use of your device, your telemetric device. Did I say that right? The blue plans have all agreed to say our device is not medically necessary, which is a key language. And we also plead that there's a Kafkaesque appeal process, which is prohibitively expensive for an individual. So their say is basically final. We did take some test cases and we won them, but they just kept doing what they were doing. So as a practical matter, they have the final say so. They can't individually make the decision to turn us down. We don't think they would with all the scientific evidence against them and all the other, Medicare doesn't do it. Nobody thinks this except supposedly by coincidence, the only people who think that ours is not medically necessary, by coincidence is these 34 plans. They all come to this conclusion year after year. This is a concerted effort to keep you out of the market. We don't know the motive. We haven't done discovery. We just know they're doing it. We don't know why they're doing it. We've tried to talk them out of doing it, but they stubbornly adhere to this position. Medicare has ensured this for 10 years. Medicaid has. The major competitor Aetna has. Every scientific study has come out to the conclusion that we're state of the art. We've had government, three different states, have issued rulings that we are state of the art for certain. The American Heart Association has a chart of what might be malpractice, in fact, not to prescribe our device even though it's uninsured, but they keep saying it's not medically necessary. There's no good explanation for why they're doing this. The 34 people simultaneously every year make the same mistake. There's no other good explanation. What's your antitrust injury? Excuse me? What's your antitrust injury? The anti-competitive effect injury. Right. The anti-competitive effect is almost precisely what was found in West Penn. Most conspiracies, of course, are seller-side, price-fixing or something. So there's not that many buyer-side conspiracies out there. West Penn is great for us because it involves Blue Cross, it involves the health care industry, it involves a conspiracy to prefer one hospital, in that case it's a hospital provider, not a device provider, but same idea, prefer one provider to another provider. And West Penn does a brilliant analysis, it's the best analysis ever of this issue, lays it out perfectly, cites all the other authorities we could possibly, we found nothing they didn't cover, and what they lay out is exactly why a buyer-side conspiracy has anti-competitive effects. And what we did is we wrote a complaint, and unsurprisingly we tracked what West Penn said to the extent we had the same facts. It lowers output, it lowers demand, it distorts demand, it causes consumers to buy something that's not their first choice, it discourages research and development, it discourages innovation. Therefore, in the long run, it reduces volume, which in the long run raises prices. It's a very sophisticated economic analysis, the kind of thing an expert ought to do. We pled the language of West Penn, and also the Brown case, which is much different facts, but it's another Third Circuit case. We have the same anti-competitive effects that they held were true in almost every buyer-side case, and true in ours and true in theirs. Isn't that the case, though? Maybe you answered this before, but I have to ask you again, that individual insurers can make specific individual requests, an exception to the model policy? No. Here's how it works. Individual, a patient goes into the doctor with a heart condition. The doctor prescribes one of the four cardiac monitors. If he prescribes ours, they then have to call Blue Cross and get it approved. It's not approved, so then the doctor has to prescribe a different one. The doctor, after a while, learns this is going to happen and quits prescribing. Is this always the case? It's always the case. As I say, we try to take appeals on behalf of the patients. We have effectively no right to appeal. We have to accept whatever they do, but the patients have a right to appeal. We've sponsored 18 patient appeals and won every one, but they continue, unless you take an appeal and win it, they continue to deny it to everybody else. We've slowed the process here, three layers of appeals. This device costs a few hundred, $500 or something. The appeals cost $20,000. So who's going to take an appeal? It's academic. I have one more question for you. Given the business of insurance is probably one of the most regulated on a state-by-state basis, and Blue Cross Blue Shield is regulated by the state of New Jersey, why doesn't the Karen Ferguson Act prevent your lawsuit?  And the language is quoted at our brief on page 20, and the court doesn't need to look at it. It's very short. I can read it. And what it says is that no act of Congress should be construed to invalidate, impair, or supersede any law enacted by a state for the purpose of regulating the business of insurance. Okay, so the question is so do states have a right to enact those laws? The question is what does it mean to regulate the business of insurance, which came up in the Pairino case, which follows well the drug, but Pairino was always cited as the definitive case. And what Pairino said is this has to be narrowly construed. It can't mean things that people in other businesses are trying to save costs and interpreting contracts or anything. It has to be limited to the context in which the Karen Ferguson was passed. Here's the context in which it was passed, and there's case after case, Supreme Court and other courts that summarizes history. Let me quickly summarize it. The problem was that until 1944, all the states regulated rates, and nobody thought, and so all the insurance companies would get together, agree on a foreign policy, pool their data, and then submit their rates. This was actually pro-competitive because if you want to be a new entrant, let's say the auto industry, you've got 1% of the customers, but someone else got 50% of the customers. You can't set your rates as effectively if you don't have the accident data. So pooling the rates was a good idea. Everybody did this. Blue Cross's argument is that they were cooperating. They had to model policy as part of their cooperative efforts in rate making and underwriting risks. I see exactly what the statute in the Karen Ferguson Act protects. No, actually, according to Supreme Court, that's the exact issue in Pairino. Pairino presented this exact issue. In Pairino, the insurance companies got together, and they went to a chiropractor's group, and they let the chiropractor's group decide what was in and what was out, kind of like the model policy group here, and they all followed it, and they said that's the business of insurance. Pairino said no, we have to interpret that narrowly. This was not designed. The Supreme Court is quite clear. There was no blanket permission for insurance companies to be exempt from the antitrust laws. It's designed to protect rate-making-type things, where you have a regulatory apparatus. So when you get your form approved, if the form says no chiropractors or you have to have chiropractors, and the form is approved by the state, that's the business of insurance. But if it says medically necessary, now that it's issued, that's the transfer of risk, and now you're interpreting it, that's not the business of insurance anymore. I mean, it sounds like the business of insurance, but Pairino made it very clear that once you're past getting the form and the policy approved, it's not regulation of insurance. It's not the business of insurance. It's also, according to Humana, not the regulation of insurance, because the claim of regulation here is not that policy interpretations are. . . I see I've gone over my time, so I'll lose some of my time. I do want to answer this. You have eight minutes to go. I'll tell you what, we'll give you some more time now. How about five minutes? We're going to give you 17 anyway instead of 12. I appreciate that. I didn't foresee this. Five on rebuttal. But I did want to cover the Karen Ferguson. That's why I wanted to reserve the time, so this is fine. Okay, so we can deal with the regulated part, too. The business of insurance is completely disposed of by Pairino. There is absolutely no room to distinguish that case. It's pointed out in our briefs. It's exactly the same case. Interpreting the policy after it's issued by consulting an outside group. The outside group is themselves. It's precisely the case. So it's not the business of insurance. There's two other reasons why it's not either. It's all in our brief. But where is the Blue Cross entities, their telemetry coverage, decision-making described in the record? Where is the decision-making described in the complaint? I guess the complaint would be the only thing I can think of. I know it is in the complaint. I thought I had it. I'm embarrassed. I should know the answer to this. Well, you can tell us about all of that then. Perhaps I reply I can do this. Okay, that's fine. You know, the device that you're talking about may be state-of-the-art. I don't know. I know it sends messages directly to a physician, I think, from the record that I read. So that's kind of very good. The others don't seem to do that. The others rely on the patient themselves to convey information. So that's a big difference. But what makes it so – I mean, is it proven to be the very, very best thing? Is it state-of-the-art? Is it the only thing that patients with serious heart problems have to have? Your Honor, I would like to answer that, but I'd also like to answer the regulation by the state. So why don't I do this last question first and then go back to it. All right. So what the scientific evidence shows is that if you take the four basic groups, as we explained for four pages when we described the relevant market, there's subgroups. So you have event monitors, remains, telemetry, too. It's kind of a continuum. But here's what ours does that the others don't do. Yeah, I'm just wondering if this is your judgment or is it Blue Cross Blue Shield that has made that judgment. Your Honor, to our knowledge, there are 12 scientific studies that all agree. We cite them all in a way where someone could find them on the Internet and dispute them if we didn't get it right. All of the studies agree that ours is superior in some situations. Not everyone – ours is more expensive. But for some people, it's far superior to any alternative. The American Heart Association has a chart, a decision tree chart, which is reprinted in our complaint right out of the American Heart Association journal. And it shows a decision tree, yes, no, for different things. And it shows for certain – it shows exactly where ours is preferred and where ours is the only one available. So we're not saying every single person needs our monitor. But a third of Americans have this issue. There's tens of millions of people who potentially could need heart monitors. Some millions of them all get ours and they're not getting it. Your point is that Blue Cross Blue Shield is making its decision because of the cost of coverage. They are making – we don't really know what their motive is. We haven't had discovery. The cost of coverage compared to the medical industry in America is – what they're doing, I think, is irrational. Apparently, cost is driving them. Maybe stubbornness is driving them. The point is they can – all 34 of them can look at the facts and make a decision against us, and we're kind of stuck. What they can't do is all get together and agree that they're going to reinforce each other to go along with the majority. They cannot – the antitrust laws do not permit that. We're going to have a chance with each of the 34 to talk them into it. Can I just deal with regulation by the state? We'll give you 30 seconds on that, and then we'll get you back on the road. Humana made it clear that the Unfair Claims Practices Act is not regulation by the state. It sets out a bunch of rules. If you violate the rules, you can be fined. That's not regulation by the state. Rate making, where you have to come in, file something, notice, public hearing, and an administrative decision, that's regulation by the state. The question is whether RICO is different from antitrust laws. I think if anyone reading the statute, which we quote fully on page 20, there's no textual – I was going to go into that, but there's no textual basis for making that distinction. No court has applied Humana's rule to an antitrust case. To me, the only intellectually interesting issue in this case, where it's not already completely disposed of by Supreme Court and third circuit cases, is whether Humana should be extended to antitrust cases. This court, I think, would make a contribution to jurisprudence by making it clear that it should be. Thank you. Thank you. Mr. Leighton. Thank you, Your Honor. May I please the court, Dan Leighton, the Kirkland firm for all appellees. Just ask one fact at the outset. Did Highmark at one point cover telemetry devices? The answer to your question is yes, Your Honor, and it doesn't stop there. Paragraph 82 of their complaint and footnote 2 on paragraph 84 of their complaint made clear that Highmark covered. In addition, and I have to say I've learned more about plaintiff's claims today in this oral argument than is ever below, but a lot of what I heard first isn't in the complaint and second is irrelevant, but what is in the complaint, Your Honor, is paragraph 61, which sets forth A through F different blue plans allege coverage decisions with respect to these telemetry monitors. And it is not all simply adoption of the Blue Cross Blue Shield Association medical policy. In fact, A is WellPoint, which is Anthem, which is the largest blue plan by number of states, says it's not as medically necessary for all indications. Alabama, which is F, says it's situational. So this is going back and forth. But Highmark stopped covering, right? No, Your Honor. They still cover? Highmark covers. The issue is that blue plans operate in service areas, and when care is administered in one blue plan service area, that plan acts as sort of the point of contact for coverage decisions. And so that's the allegation that they're trying to explain. But the answer to your question, Your Honor, is Highmark covers according to their complaint. Your comment at the outset that there's a whole lot that you're discovering today that you didn't discover before might invite the flip response as that's why we need discovery and maybe have this case go to summary judgment but not have it decided on 12p6. Not at all, Your Honor. As I said, everything that my friend said today is irrelevant to the allegations in the complaint. And I would focus first on an agreement. And here there are nine. We can be specific. There are nine paragraphs in their complaint that they cite as evidence of the agreement. And the first supposed direct evidence is paragraphs 57 and 58. They omit from their brief 59 and 60. Those mention by name the model medical policy. That encompasses their audit allegations. It encompasses their uniformity rule allegations. Both of those allegations specifically describe the model medical policy, which is uncontested this court can refer to and which says by its very terms it doesn't apply or it's not binding. And Judge Fuentes, you asked the question on whether it's binding. Putting aside paragraphs 82, 84, and 61 of their own complaint, this is a situation like this court confronted in insurance brokerage where the issue was the extent to which brokers were disclosing their receipts to contingent commissions. The brokers all belonged to CIAB, which was an industry trade association that had a model disclosure policy. And, in fact, unlike here, the Third Circuit in this court of insurance brokerage said there was adoption by each broker of the model policy. But the Third Circuit affirmed the dismissal because you can't infer an agreement to Judge Fuentes' question. You can't infer an agreement from the simple fact that there is a model policy. The only thing that there's directly... Well, I mean, maybe you can help us here. Insurance brokerage, if you have parallel conduct, that in and of itself is not enough. At one point it says you need a plus factor. And above that, one might be able to read that you need, if there is any reasonable explanation alternatively, that would do it. Well, you can't have both of them. Which test is it that we need to apply? Your Honor, they put forward the model medical policy as alleged evidence of a direct agreement. But in the circumstantial world, which is where insurance brokerage was, under Twombly, you clearly need parallel conduct and plus factors. Parallel conduct under Twombly is not enough. You must go to plus factors. Here you have neither. You don't have parallel conduct. The plus factor would arguably be that you have an audit if you're not in compliance, and you're found to be out of compliance, and therefore you're not going to be covered. Two responses. The first is that paragraph of the complaint, 58-59, that referred to the audit, I think it's 58, refers explicitly to the model medical policy, which if you read that, says each plan is entirely able to make its own independent decision, and don't say otherwise because it wouldn't be true. How many blue plans are there in New Jersey? Can you tell? There are three. There's IBC, Highmark, and yeah. So when you have a ñ all right, that's New Jersey. When you have a model policy, how many plans follow that policy or are expected to follow it? Each plan, as the medical policy makes clear, Exhibit 1 says each plan is able to make its own determination. I don't know, standing before you, Your Honor, with respect to ñ I read somewhere that if you don't follow the policy, you get sanctioned. Again, that's paragraph 58 of the complaint, and it simply refers to the model medical policy, which is Exhibit 1. They don't have a well-planned allegation of that. But I want to get to the second point, Your Honor. Tell me whether that's true or not. Which is a separate point. And that is if at all it would be relevant to the third plus factor under insurance brokerage, which is sort of the traditional notions of conspiracy. Before you get to that, in a circumstantial case under Trombley, you have the possibility that the complaint itself reveals an obvious alternative explanation, which paragraphs 7 and 69 do. This is the three times more expensive, and Blue Plans did this in order to reduce cost. This is not a case ñ Are you saying that if you give a reasonable alternative explanation, you don't need a plus factor? You don't need to deal with plus factors. That is my position, and I'll be happy to explain why. Go ahead. Because under Trombley, what we're trying to do is determine whether we can infer a plausible conspiracy. And if the complaint itself reveals that a conspiracy is implausible, then the edition the courts look at in order to pile up a bunch of pieces to try to cobble together a conspiracy can't work. What's really important about this case, Your Honor, though, which distinguishes it from the out-of-circuit cases that LifeWatch relies on, is this is not a case where Judge Rebrano made up facts and relied on that competing inference, or we supplied facts. This is a case where LifeWatch's own allegations in its own complaint reveal the obvious alternative explanation, and I believe that this court's ruling in Birch is on point in those circumstances. There you have an alleged refusal to deal by financing companies to a manufacturer, and there was different conduct at different times, but the court looked at the complaint and said, look, the complaint screams out that there's an obvious alternative explanation. It's in the complaint. It's that the plaintiff was failing. So, of course, the defendants are now exempt. Now, as your inquiry says, it's true that allegations of conspiracy are deficient if there are, quote, obvious alternative explanations for the facts alleged. And then it goes on. A corollary of this proposition is that plaintiffs rely on fair law conduct, much less facts, that if true would establish at least one plus factor, since plus factors are by definition facts that tend to ensure that courts punish concerted actions, et cetera, et cetera. So one might argue theoretically they're opposed, but I think the opinion looks to me like it's trying to say, okay, one really leads to the other. You have to have a plus factor. One absolutely can lead to the other, and you absolutely, absolutely, a plaintiff must allege plus factors in a circumstantial case. That is, they must allege parallel conduct, and they must allege plus factors. We don't think they have here because we don't think that they've alleged even an odd requirement. So what if you alleged plus factors, but you also, as a defense, you said that, well, if they allege plus factors, but you say, yes, there are plus factors. I'll concede that, but that there is an obvious alternative explanation. You're saying you get out of dodge? That's right. Now to cite the Birch case, because the question is whether the district judge can infer a plausible conspiracy, and it doesn't all add up. Have you given up on the carry and furnish? No. We'll get to that. Yeah. The product market. What is the product market here? Yes. This is, so the product market that they allege. The district judge said it's telemetry devices. That's not the product market they allege. They use nine words in two, sorry, 17 words in two paragraphs to allegedly allege an outpatient cardiac monitors. But that's not what Judge Rubino did. Judge Rubino did a very common sense thing after hearing the argument for several hours. He said there's nothing in the complaint that alleges such a market. The only allegations in the complaint about market, and Your Honors asked questions about this earlier, go to the differentiation between LifeWatch's product and competing products like holsters and insertable devices. So, Judge, somebody has, for example, let's just say some type of syncope, or maybe when they start to do certain activities, something goes wrong with the heart, and they wonder, it happens periodically, but not enough that they can, you know. Yes. Located exactly at that moment. So you would do some type of monitor, would you not? I expect so. So what type of monitor, would all four of these products work as a monitor for trying to diagnose this particular person's source of the syncope? I don't know the factual answer to that. And more importantly, and critically, LifeWatch doesn't allege it. Despite Brown Shoot, despite DuPont, there is no allegation of reasonable interchangeability or substitutability among these products. This court would be the first ever to allow 17 words which simply say, in the second market for outpatient monitoring devices, or in paragraph 2, harmed competition in the outpatient cardiac monitoring device market. It would be the first court ever to sustain relevant market allegations without factual allegations of elasticity of demand, of substitutability, of reasonable interchangeability of use, that their own cases, DuPont foundational cases, require. This court's ruling in Queen City Pizza says you can't just allege the legal conclusion. You have to allege facts. The only facts that are alleged lead you to exactly where Judge Robrino went, which is, well, despite the fact that you seem to be asserting a broader market, I'm going to give you the benefit of the doubt. I'm going to go to a telemetry market. If they don't allege that, they're not relying on that. Does anybody else do telemetry devices? I don't know the answer to that. But I believe the answer is yes. I mean, if the answer is no, then making the product market the telemetry market would make no sense. I believe the answer to the question is yes. Because the reason I believe that is I believe that LifeWatch's brief refers to other telemetry makers. In fact, all of their allegations on antitrust injury actually don't refer to LifeWatch itself, but to telemetry makers sort of as a category. Is it yes that they have a very unique product in the sense of being telemetric and conveying information instantaneously? LifeWatch alleges that its product is very different from other outpatient cardiac monitors, which is the reason, as a matter of law, they cannot sustain a relevant product market that includes all of them. LifeWatch says to us in their response, it is absolutely the case that you can have a relevant market that has competing products in it that aren't all the same. And to that we say, absolutely. You absolutely can have that type of market. But here's the thing. You have to allege facts that show substitutability and interchangeability of use. They've had three chances at this over five years. They know they can't. They have all but abandoned the relevant market. It is, as a matter of law, impossible for them to succeed on their claim without a relevant market allegation. And their relevant market allegation cannot be sustained under any case in any circumstance. In fact, the only complaint allegations that they rely on for their relevant market allegation, they don't even point to the two that I point to. It actually spells it out. They point to paragraphs 37 to 41, which are circumstances, and you heard this in the opening argument, circumstances where there have been reversals, administrative reversals of coverage decisions, or, sorry, 37 to 41 talk about the real differences that they allege between telemetry and the other products. That's the opposite of what they need to be alleging to sustain a relevant market. Here they cannot succeed in the market that they've alleged, and it fails for that reason alone. When you go to, even though they have a more narrow market, they allege that, and they rely on West Penn for the idea that they've suffered antitrust injury. In West Penn, in McCready, et cetera, those cases are where they've been singled out. Once you're in a world where the relevant market is only telemetry products, they're not being singled out. They're being treated just like anybody else, and that's exactly what Judge Urbano ruled. And it's not because he misunderstood or misapprehended the relevant market allegations made by LifeWatch. It's because the relevant market allegations that were made by LifeWatch were illusory, and he cut right through them. And so then you're left with, you don't have a relevant market allegation, and you also can't allege antitrust injury. Why don't you go to McCarran-Ferguson? Yes, sir. Isn't it your burden to show that McCarran-Ferguson applies? Yes, and with respect to the narrowly construed, certainly as a whole, it's narrowly construed. What that doesn't refer to is the state regulation part, which they say no case that suggests that there isn't sufficient state regulation. The health insurance markets are extremely state regulated. We offer that in the brief. I don't think we need to say anything more about it. The question really for this is where is the transfer of risk? My friend relies on Perino. It was really only Perino, Royal Drug, and insurance brokerage. Perino, which by the way, did not allege a conspiracy among insurance brokers. It did not. I'm sorry, among insurers. It did not. It was one insurer, ULL, that was allegedly conspiring with this association of chiropractors to determine whether particular sessions with chiropractors were reasonably cost and reasonably necessary. Perino takes the process and breaks it down into two segments. First question, in Perino, was chiropractic services covered? Yes, they were. Absolutely. That's why it wasn't a business of insurance case, because what Perino was was after the fact. Yes, covered, under certain circumstances, behind the scenes, policyholder doesn't care. Where that or like Royal Drug with how much the insurer is going to pay the pharmacist for the prescription, that's part two. But what you heard my friend say today is what they said in their brief. This is part two because it requires a determination of what's medically necessary. Well, that just mischaracterizes the agreement they allege. The agreement they allege is that all due plans impose a medical policy that refuses under any circumstances to cover. We are squarely, squarely in Perino phase one. That is the coverage decision. Insurance brokerage tells us that it is the type of coverage that you're buying that is the question of business of insurance under transferring and spreading risk. The question is, is it the policy? The answer is yes, it is the very policy. It is the medical policy. It's actually what the insurer is buying that's at issue. In this case, will the insurance contract that I'm buying cover WISBANG telemetry monitors or won't it? That is exactly the type of coverage. It's Perino phase one and not phase two, which is some post-determination blind to the policyholder type of issue. We submit that it's very clear under Perino ground driving insurance brokerage that this is the business of insurance for purposes of the transfer and spreading of risk. I'm not sure it's very clear. In this case, there's an argument that it isn't so much the business of insurance. It's a, if you take the other side's point of view, that it's a keeping them out of the market if the market is outpatient cardiac monitors. That isn't so much the business of insurance, is it? I believe it is. Here's why. In Perino, if ULL, the insurer, had as a policy, instead of recover chiropractic services, but you've got to go to this board to do the post-mortem, hopefully not in real life. If the policy in Perino were challenging whether chiropractic services would be covered under the policy, I believe that's Perino phase one. That's the step one in Perino. I think that's what the court is telling us is the business of insurance. So the question under Perino and road driving insurance brokerage is, is it the policy? And I believe the answer is yes, because what you're buying as an insured, what you care about is the coverage you're getting, and that's exactly what's happening here. What's the underlying purpose of McCarran-Ferguson? Is it a protective measure by Congress, or does it serve another purpose? It's to protect intra-industry collaboration. That's at page 129 of Perino. And that is? Intra-cooperative interaction. I suppose that's Blue Cross Blue Shield working with the other group leaders. That's exactly right. You have 36 blue plans with their licensor doing exactly what, I mean, just take their allegations wholesale. It's intra-insurance conspiracy. It's actually, that goes to this third point of whether it's outcome determinative, which Perino says it's not, that you have someone outside the insurance industry. Blue Cross Blue Shield is headquartered in New Jersey? Blue Cross Blue Shield Association, the licensor, is headquartered in Chicago. But are you regulated by a New Jersey state law? Different plans are. Each plan is regulated by the states in which it, the association itself doesn't offer any insurance, just like the Chiropractor Association of Perino wasn't issuing insurance either, and that wasn't an issue under McCarran. Is the telemetry device not covered solely because of cost, or why? The reason that LifeWatch supplies is paragraph 69, which says cost. You heard a stunning admission here, which is other than that, they can't, they have not alleged an anti-competitive motive. Why would plans collude? What he's saying is he needs to have discovery in order to figure out what the motive is. But what he is saying is that there is an agreement. He doesn't know why the agreement necessarily is in place. That is not enough to sustain a complaint under Rule 12b-6. You have to allege. Look, in a price-fixing case, it's easy to establish a motive. It's excess profit. Here they don't, there's no excess profit. Every blue plan competes in a big world against non-blue insurers. The agreement that LifeWatch alleges would be against, if everything that they say is right about how great these are, blue plans would be getting beat up in the marketplace when they're competing against Aetna, United, Sigma, etc. So the fact that you can't supply a motive is under insurance brokerage, which demands... But according to the complaint, or according to your opposing counsel, of the 34 plans that don't cover telemetry devices, they're, in the end, a very big player. LifeWatch cannot allege that there are 34 plans that cover this. Paragraph 61 precludes that. They allege that blue plans are large, but they can't allege the counterfactual, that there's not strong inter-brand competition for health insurance in this country and in any place. And they don't allege that. And the key issue here is, has LifeWatch made the allegations on its third try, after having the medical policy, after talking to witnesses? This is a case like insurance brokerage. They had chances. And we have the piece of paper, the complaint, which doesn't allege an actual agreement, which actually hoists them on their own baton for alleging different actions by different plans as they make independent decisions about their own insurance for good reasons, because it costs three times as much. And with respect to relevant market, their complaint cannot be sustained for that reason. And because we believe that this is clearly the business of insurance under Parano Phase 1, we ask this court to affirm the judgment of the law. Thank you. Thank you very much. Mr. Auto, we gave you 22 minutes. We gave you your posting counsel 23, so we're going to make you stick to your five. I will do that. I'm going to answer seven questions that came up. I'll do them in order of importance, and I assume I'll get cut off before I'm done. And let me be real fast. I'm a Karen Ferguson. Two sentences. Interpretation of a contract is not the business of insurance. Parano. Interpretation of a contract is not regulated by the states. Humana. Two Supreme Court cases. The most important thing that came up was the definition of the product market. We did not describe the product market as 17 words. In our summary at the beginning, we used 17 words. Pages 8 to 12 lay out in great detail a description of the product market, and pages 6 to 18 explain in great detail the reasons why things are interchangeable, how the scientific community comments on it, how others comment on it. The test, whether we use it, whether we plead the conclusion is really kind of irrelevant. We've gone way beyond those pleading and laid out the whole case for interchangeability. Here's a test for interchangeability. Where do you say that the product market in your complaint is outpatient devices? I know in the conclusion and in the introduction, I know you say it. Do you say it in paragraph 69? I'm sorry, 69? Your Honor, it's probably helping me out. Are your relevant markets the 68 and 69? Yeah. Thank you. Mr. Layden helped me in answering my earlier question. I fumbled 57 and 58 are where we allege audits and enforcement on the product market. The test for interchangeability, which, by the way, many cases collected in Todd v. Exelon, many, I think every certain court has said this in some case, it's inherently factual. The question of interchangeability cannot be decided in a motion to dismiss. It's repeatedly stated. Now, the test for interchangeability, according to Ellen Myland, the Third Circuit case, this is my favorite point on interchangeability. A Ford and Chevrolet are interchangeable because they both get you to work, but so do a horse and a bicycle. A horse and a bicycle are in the relevant market. It's like a Venn diagram. There's some overlap because they all get you to work. There's difference in price.  Here, we don't have a horse and bicycle. We have maybe a Jeep and a Rolls Royce and a motorcycle. They're all the difference. There is price difference, and there are features difference. There's a difference between a bicycle and a car, too. But interchangeability does not mean identical products. It doesn't mean commodities. It means products that can compete with each other. This is laid out in detail by the Supreme Court in the Third Circuit and in our brief. Yours is very different, though, isn't it? I mean, your product is very different from your competitors, isn't it? Actually, not. I thought that you touted the idea that your product sends out an immediate, almost immediate message regarding a patient's health, heart condition, and it has the capacity to do that, I appear. Unlike the other products, that doesn't happen. We all respect that it's not an issue that this Court can consider because it's a factual issue. What we pled, which is what's before the Court, is that the market is for cardiac monitor devices, which can be explained for ten pages why that's the market. I mean, it may be that on summary judgment they'll be able to argue about the relevant market. I doubt it very much. I have to tell you, I was actually impressed by your product. I thought it was pretty impressive. What it does that all the others do not do. In Pages 8-12, we explain that actually some of the event monitors have adopted some of our features. It's kind of a continuum now. You can use telemetry. Some of you have to use a phone. Some of you have to bring in a monitor. You pay a little more to get a little more benefit from it. And this is like the difference between a Rolls Royce, a truck, a car. They all give you the work. They all have additional features and benefits that you pay more or less for. That's what interchangeable means. If a horse, a bike, and a car are in the same relevant market because they all get you to work, surely all these monitors all get your heart measured. They get the information to the doctor just using slightly different means. I would put a horse in the same market as a Ferrari. Well, I would not agree with the Third Circuit in Allen-Milan, the first case cited in our table of authorities. I just like it because it's so punchy. Other cases are very similar. You don't need to be identical to be competitive. You just need for some customers to be interchangeable, not even for all customers. If I have time, I've dealt with two of my seven points. If I have time, let me just point out. We'll give you two more minutes and we'll shut up. I appreciate it, Your Honor. The reason product market is being made a big deal out of is because of the opinion at page 20. If there's an explanation of what the judge did, it's on page 20, and it specifically rests on this error. There's also other references in the case. It specifically rests on the error that since telemetry products compete with each other only, there can't be a hurting competition. That's the reason that my very able opponent has taken that difficult issue on. Is he headed? How else can you defend what the judge did? Very quickly, the obvious alternative explanation is the standard for summary judgment. Many courts of appeals, courted in the non-replied brief, criticized district courts for doing what this court did at page 10, note 6, applying the motion for summary judgment standard and a motion. We obviously with no discovery cannot exclude every possible alternative explanation. How could any plaintiff do that? Next, the fact that one plan or two plans did not cooperate. It's specifically dealt with in page 13, note 5 of our opening brief. Here's what we say. We say this issue was not raised below. It was not relied on by the district court, and therefore we're not going to say anything about it unless they do, and the reason they probably didn't raise it is because the law is uniformly against them. We cite a couple of cases, uniformly against them. You don't have to have every single person comply every single time. It's a very settled law. In their brief, they come back, cite nothing, don't discuss our two cases, don't dispute that they never raised this before, and the district court never relied on it, and they raise it. All right. You have 30 more seconds. Why don't I? The court's been very indulgent with me. Let me not abuse it. I appreciate the little bit of extra time. You have 30 seconds. Tell them, Richard, is your beef solely with Blue Cross Blue Shield? I mean, your product, I would imagine, has national presence. Do you have that same problem with insurers in other states or other parts of the country? No. Everyone else covers us, I think, just about everybody else covers us, only Blue Cross Blue Shield, but it's 36 or 37 companies that we have a dispute with. It's the organization, minus two we have side agreements with. Have they approved any telemetric devices? I'm sorry? Have they approved any of your telemetric devices? No. No telemetry. To the best of my knowledge, all telemetry they refuse to insure. We, by the way, there's another major player in the market, which we recently merged with. I think the merged company may have 70% or something of the market. There are a few small companies. What is the cost difference between your product and your competitors? Our product is something like about $600 or $700, and the cheapest product is something like $200, and then there's a product that's over $1,000, but it has to be inserted by surgery. It's a big difference, is it? Yes, and they are saving money by depriving their policyholders of the best monitor available and giving them a cheaper monitor. Some of those clinicians are being hurt. That's true. You're in the same market even though your product is three times more than that? I'm a little hard of hearing, and I apologize. You're in the same market even though your product is three times more than your competitor? We are three times more expensive than the cheapest monitor. Yes, than the cheapest. But there's a range. There's a whole continuum as we lay out four basic types and then variations within types. So we go from $200 to over $1,000. We're around two-thirds of the way up. Thank you very much. Thank you very much, counsel. Thank you for very well presented arguments. I would ask that counsel would get together with the clerk's office and have a transcript prepared of this oral argument. And, again, thank you very much for being with us today. Appreciate it. Thanks for the extra time.